UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
ARAMINTA ROA,                                               :
                                                           :
                                        Plaintiff,          :
                                                           :
            -against-                                       :        7:16-cv-1745 (VB)
                                                           :
                                                           :
STAPLES, INC.; STAPLES THE OFFICE                          :
SUPERSTORE EAST, INC.; and STAPLES                         :
CONTRACT AND COMMERCIAL, INC.,                             :
                                                           :
                                        Defendants.         :
------------------------------------------------------------ x


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


BERNBACH LAW FIRM PLLC
707 Westchester Avenue, Suite 411
White Plains, New York 10604
(914) 422-5717
Attorneys for Plaintiff Araminta Roa

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Plaintiff's Disabilities, Resulting Work
        Restrictions and Staples' Disregard Thereof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  Plaintiff's Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT
        AMPLE EVIDENCE EXISTS TO
        FORESTALL SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.  Plaintiff Establishes a Prima Facie
        Case of Disability Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.  Plaintiff Meets the Third Element of
           Her Prima Facie Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.  Plaintiff Meets the Fourth Element of
           Her Prima Facie Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

           a.  Defendants' Theft "Investigation"
               Was a Demonstrable Sham . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

           b.  Upia's Disability Animus
               Poisoned the Well . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B.  Plaintiff Has Adduced Sufficient
        Proof of Pretext and Thus of Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**TABLE OF AUTHORITIES**

**CASES**                                                                                            **Page**

Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . 17

Alexiadis v. New York College of Health Professionals,
    891 F.Supp.2d 418 (E.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Azar v. TGI Friday's, Inc., 945 F.Supp. 485 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 24

Bacchus v. NYC Dept. of Educ., 137 F.Supp.3d 214 (E.D.N.Y. 2015) . . . . . . . . . . . . . . . . . 23

Bogan v. Northwestern Mut. Life Ins. Co., 144 F.R.D. 51
    (S.D.N.Y 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 15

Bush v. Fordham Univ., 452 F.Supp.2d 394 (S.D.N.Y 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 17

Costello v. St. Francis Hosp., 258 F.Supp.2d 144 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . 17

Cotran v. Rollins Hudig Hall Int'l, Inc., 948 P.2d 412 (Cal. 1998) . . . . . . . . . . . . . . . . . . . . . 20

Daniels v. Pioneer Cent. Sch. Dist., 2012 WL 1391922
    (W.D.N.Y. Apr. 20, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Danzer v. Norden Sys., Inc., 151 F.3d 50 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Durling v. Uddo & Assocs., 1993 WL 33645 (S.D.N.Y. Feb. 4, 1993) . . . . . . . . . . . . . . . . . 24

Emmanuel v. Cushman & Wakefield, Inc., 2015 WL 5036970
    (S.D.N.Y. Aug. 26, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Esposito v. Donahoe, 2015 WL 5561287 (E.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Felix v. NYC Transit Auth., 154 F.Supp.2d 640 (S.D.N.Y 2001) . . . . . . . . . . . . . . . . . . . . . . 16

Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 19

Garcetti v. Ceballos, 547 U.S. 410 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Graham v. LIRR, 230 F.3d 34 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Grana v. Potter, 2009 WL 425913 (E.D.N.Y. Feb. 19, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 22

Henchey v. Town of N. Greenbush, 831 F.Supp. 960
(N.D.N.Y 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Holleman v. Art Crafting, Inc., 2014 WL 4907732
(E.D.N.Y. Sept. 30, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Ibrahim v. New York State Dept. of Health, 904 F.2d 161
(2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Jeunes v. Potter, 2009 WL 2883060 (D. Conn. Sept. 3, 2009) . . . . . . . . . . . . . . . . . . . . . . . . 22

Jian Wang v. IBM Corp., 2014 WL 901507
(S.D.N.Y Feb. 11, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Katz v. Adecco USA, Inc., 845 F.Supp.2d 539 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . 13

Lewis v. Blackman Plumbing Supply, LLC, 51 F.Supp.3d 289
(S.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

McBride v. BIC Consumer Prods Mfg. Co., 583 F.3d 92
(2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Norville v. Staten Isl. Univ. Hosp., 196 F.3d 89 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 16

Owens v. NYC Hous. Auth., 934 F.2d 405 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Petrosky v. NYS Dept. of Motor Vehicles,
72 F.Supp.2d 39 (N.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Punter v. City of New York, 2005 WL 2095733
(E.D.N.Y. Aug. 30, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Raymond v. IBM Corp., 148 F.3d 63 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . 18, 25

Risco v. McHugh, 868 F.Supp.2d 75 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Rivera v. New York City Hous. Auth., 1998 WL 108032
(S.D.N.Y. March 11, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

Robinson v. Gucci Am., 2012 WL 259409 (S.D.N.Y. Jan. 27, 2012) . . . . . . . . . . . . . . . . . . . . 18

Ross v. IBM Corp., 2006 WL 197137 (D. Vt. Jan. 24, 2006) . . . . . . . . . . . . . . . . . . . . . . . 18, 20

Sethi v. Narod, 12 F.Supp.3d 505 (E.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Shafrir v. Ass'n of Reform Zionists of America, 998 F.Supp. 355
    (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Sharpe v. Utica Mut. Ins. Co., 756 F.Supp.2d 230 (N.D.N.Y. 2010) . . . . . . . . . . . . . . . . . 21

Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 13

Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 15

Stern v. Trustees of Columbia Univ., 131 F.3d 305 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . 18

Stratton v. Dept. for the Aging, 132 F.3d 869 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 18

Thompson v. Am. Eagle Airlines, Inc., 2000 WL 1505972
    (S.D.N.Y. Oct. 6, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Trane v. Northrop Grumman Corp., 94 F.Supp.3d 367
    (E.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Villar v. City of New York, 135 F.Supp.2d 105 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . 18

Welch v. UPS, Inc., 871 F.Supp.2d 164 (E.D.N.Y 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Zimmerman v. Assocs. First Cap. Corp., 251 F.3d 376 (2d Cir. 2001) . . . . . . . . . . . . . . . . 17

## STATUTES AND REGULATIONS

42 U.S.C. §12111(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. §12111(9)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

29 C.F.R. §1630.2(n)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Plaintiff Araminta Roa ("Plaintiff") respectfully submits this memorandum of law in opposition to the motion for summary judgment of defendants Staples, Inc.; Staples the Office Superstore, Inc.; and Staples Contract and Commercial, Inc. ("Defendants" or "Staples").

## STATEMENT OF FACTS

**A.    Plaintiff's Disabilities, Resulting Work Restrictions and Staples' Disregard Thereof**

Hired as a temporary employee by Staples in 2004 to work as a Picker in the Production Department of its Montgomery, New York warehouse, plaintiff thereafter, as of 2013, graduated to full-time employment with the company, and served her final eight years there as a Picker in its Bulk Department at that same facility (Pl. 56.1 Stmt., ¶¶63, 64).[1] Also in 2013, plaintiff began receiving a number of medical diagnoses in connection with a constellation of painful physical conditions she had been enduring, for which conditions she would, going forward, be prescribed an assortment of potent medications (*Id.*, ¶68). From then on through the termination of her employment with Staples on July 13, 2015, she periodically furnished defendants documentation from her treating physicians that (a) alerted Staples to her being on sedating medication for her conditions; (b) imposed upon her a series of restrictions on the manner in which she was permitted to perform her job duties; and (c) expressly alerted Staples more than once to the fact that she would by virtue of her conditions and restrictions be less productive in the execution of those duties (*Id.*, ¶¶69, 70).[2]

---

[1] Pickers such as plaintiff were charged with retrieving from throughout the Montgomery warehouse the various items comprising customer orders and packing them onto pallets for shipment (*Id.*, ¶65). In the Bulk Department, these items, which were to be lifted and carried and set onto the pallets by the Pickers, were too big to fit on the facility's conveyor system and were as such routinely transported once on the pallets by way of machinery, *i.e.*, motorized pallet jacks, such that the job of Bulk Picker was a physically demanding one (*Id.*, ¶66). In contrast, in the warehouse's Production Department, the picking was of a decidedly less taxing nature, with the items the Pickers were called upon to collect being on the order of mere individual office supplies such as pens and folders (*Id.*, ¶67).

[2] Specifically, plaintiff was during that span found to be suffering from cervicalgia, two herniated disks in her neck, a torn labrum muscle in her shoulder, an injured wrist and finger, carpal tunnel syndrome in both her hands and significant attendant pain, and was accordingly placed by her doctors on light duty, and as such restricted by them

Per applicable procedure, injured employees under resulting work limitations were to be reasonably accommodated by Staples, with notice of the restrictions to be provided to the facility's nurse and Human Resources Department, as well as to the employees' managers, and indeed Francisco Upia ("Upia"), plaintiff's manager during this time, acknowledged that he was apprised by Human Resources of the limitations in place in regard to her and in receipt of the medical paperwork submitted by her instituting them, and that he was aware as well generally of plaintiff's underlying conditions and that she was taking medications for them (*Id.*, ¶¶78-80). Upia also claimed to have always abided by these restrictions and thus to have never made plaintiff perform any work not in accordance with them, and that he had at no time harbored any desire to see those restrictions ended or ever inquired about their removal  (*Id.*, ¶81).

Upia oversaw the Montgomery Bulk Department, and was thus ultimately responsible for its performance, as gauged in large part by its productivity, which itself was measured in terms of the volume of customer-order cases his team packed, and specifically against goals for such set by Staples (*Id.*, ¶82).[3] Each employee in his Bulk Department also had their own individual goals, and though, again, in the medical documentation plaintiff filed with Staples and that was then forwarded to Upia, her orthopedist explicitly warned that on account of her injuries plaintiff "will likely be less productive during their time," and despite the fact that Upia expressly acknowledged this to Human Resources,[4] Upia made utterly no allowance or adjustment for this,

---

from (a) lifting loads above a designated weight – first 50 pounds, then 30, and finally 10 – (b) raising or reaching her arms above shoulder-level; (c) turning or twisting her neck; (d) operating machinery; and (e) engaging in tasks or actions involving repetitive motions (*Id.*, ¶71).

[3] Upia's own personal performance was evaluated, in the annual performance appraisals issued to him and that dictated whether or not he would receive a raise, on the basis of his unit's performance vis-à-vis its goals (*Id.*, ¶83).

[4] In a December 18, 2013 email he sent to Montgomery's Human Resources Coordinator Nicole Barchi ("Barchi"), Upia stated, in relevant part: "Araminta wants to talk to you… I think she wants to talk to you about FMLA-Leave of absence and disability. Especially now that she has her restrictions *from her doctor stating that she is not going to be productive doing light duty work.*" (*Id.*, ¶¶70, 86)(emphasis added).

and thus held plaintiff to exactly the same personal productivity goals imposed upon every other non-injured, able-bodied worker in his unit, asserting repeatedly that, even with her conditions and attendant restrictions, she was limited in neither the work she could perform nor the level of productivity she could attain by way of it (*Id*., ¶¶84-90a). Yet, plainly, that plaintiff was (a) afflicted with multiple painful physical conditions; (b) on strong medication therefor that adversely affected her concentration and precluded her from operating the machinery that each of her department coworkers utilized ; and (c) as a result of both, subject to a range of constraints on the ways in which she could perform the work by which she was to meet her productivity goal rendered it wholly predictable that her productivity would diminish, and in fact it did (*Id*., ¶91).

 That this was both utterly foreseeable and eminently understandable under the circumstances mattered not at all to Upia, who nonetheless badgered plaintiff constantly to increase her productivity, then sought to justify such to her on the grounds that he himself was under a great deal of pressure from the company to maximize the department's productivity as a whole and hers in particular, and all the while repeatedly conveyed to her via an array of patently disapproving remarks, gestures and facial expressions, as well as a series of written reprimands, his displeasure and frustration with her failure to meet his demands and the physical impairments and accompanying work restrictions precipitating that failure (*Id*., ¶¶92, 93). Indeed, in mid-May 2014, feeling quite keenly the pressure upon him to escalate his unit's productivity, Upia petitioned the Montgomery Operations Manager, David Harrison ("Harrison"), for authority to hire a number of additional workers in order to meet the Bulk Department's productivity goal of packing 10,000 cases per day, advising Harrison that the department was staffed to generate only 8,000 cases per day, and specifically citing plaintiff's confinement to light duty as a primary ground for the understaffing and in turn the request (*Id*., ¶¶94, 96-98). Yet, Harrison denied

Upia's request, thereby leaving the staffing level Upia believed inadequate unaltered, while at the same time giving no ground either on the 10,000-case-per-day requirement, and instead reaffirming Upia's and Upia's department's obligation to fulfill it (*Id.*, ¶95).[5] Though it was customary under Staples' Temporary Modified Duty policy that light-duty assignments "generally do not exceed six months," Upia was compelled – indeed, Gina Lee ("Lee"), Montgomery's Human Resources Business Consultant and in that post head of the location's Human Resources Department, affirmed that he had no choice in the matter – to manage his department for nearly two years with plaintiff working light duty, a fact about which he expressed amazement to plaintiff (*Id.*, ¶¶100-102).[6] He also made clear to Lee, in the course of communications with her about disciplining plaintiff therefor, that plaintiff's decreased productivity while on that extended period of light duty made him "unhappy." (*Id.*, ¶104). To the point in fact that, as alluded to above, he did on that basis seek, within what would be the final months of plaintiff's employment with Staples, permission from Lee to initiate against plaintiff the company's progressive-discipline process, whose escalating steps culminated in termination (*Id.*, ¶105). And in making this request of Lee, Upia was unabashed in his vexation over and impatience with plaintiff's accommodations, practically blurting to Lee in an email: "Do we know how long bulk has to accommodate Araminta Roa? She is getting worst [sic] and not better." (*Id.*, ¶106).[7] In response, Lee – who was responsible for overseeing plaintiff's work

---

[5] The prohibition against plaintiff's operating machinery was also leaving Upia frequently shorthanded in that respect and in turn under additional pressure to borrow employees from other departments to compensate (*Id.*, ¶99).

[6] When attending a workers compensation hearing together, Upia asked plaintiff exactly how long she had been limited to light duty, and when told by her that it was nearly two years, he had replied: "Wow, that's a long time," which she interpreted as an expression by Upia of his belief that such had been *too* long a time (*Id.*, ¶¶102, 103).

[7] As noted earlier, Upia denied he had ever nourished any desire to see plaintiff's accommodations ended, or had ever even asked about having them removed (*Id.*, ¶81; *see also* p. 2, *supra*). His own above-quoted words plainly put the lie to both those claims.

restrictions – advised Upia that she was working then with Staples' Reasonable Accommodation Committee on the matter, and in subsequent contacts with him on the topic reported that the Committee had elected to continue plaintiff's accommodations, and necessarily then Upia's obligation to continue to contend with them in managing his department (*Id.*, ¶¶107-110).[8]

Deeply unnerved by the above-discussed pressure tactics directed at her by Upia and in fear for the job that was so very critical to her family's ability to meet its financial commitments, plaintiff registered her concerns with Barchi, apprising Barchi of Upia's conduct in that regard and then inquiring of her whether such was permissible while she was consigned to light duty (*Id.*, ¶111). Barchi answered that it was, thereby leaving plaintiff no choice in her mind but to accede to Upia's demands and do then whatever work he ordered her to do (*Id.*, ¶¶112-115).

Which would range far beyond what was allowable under plaintiff's regime of medical restrictions, inasmuch as Upia's drive to respond to the oft-cited pressure upon him to raise his department's productivity led inevitably to his violation of those restrictions to that end, and indeed to his contravening those restrictions on a serial basis, in regard to virtually every single one of them. Despite knowing plaintiff to be precluded from driving machinery because of her being on medication that would fundamentally impair her ability to do so, Upia nonetheless compelled plaintiff to do precisely that, and, when she objected, he lied and pleaded ignorance on account of his allegedly not having received medical documentation imposing such a prohibition, when of course he (a) acknowledged that it was company procedure that he, as

---

[8] Along the way, in late-March 2015, and showing him (along with Lee's testimony to the contrary) to have lied in his claim that he and Lee never discussed plaintiff's accommodations again after his above exchange with her in February 2015 about disciplining plaintiff, Upia asked Lee to cut plaintiff's salary on account of her machinery-operation restriction, and though Lee declined to do so, she did commiserate with Upia in his evident frustration with plaintiff and her accommodations, calling the fact of her accommodations "unfortunate[]," and assuring him: "I am working with our RA team on her situation – I know it's been a long time but I promise there will be a resolution." (*Id.*, ¶¶47(a), (b), 105). Indeed, less than four months later there would be one – permanently (*Id.*, ¶158).

plaintiff's supervisor, be furnished with such documentation; (b) admitted that he *had* in fact

been supplied such documentation, which included the machinery-operation exclusion; and (c)

had demonstrated his awareness of that exclusion by specifically discussing it early on in the

accommodation period in an email to Lee concerning plaintiff's restrictions (*Id*., ¶¶78-80, 116-

119, 121).[9] Nevertheless, Upia was unchastened, and even after this instance there were others in

which he again wrongly directed plaintiff to drive the electric pallet jack (*Id*., ¶123).[10] Upia no

less brazenly and grossly breached plaintiff's repetitive-motion restriction by assigning her tasks

such as packing calendars, opening and sealing and labeling cartons and making soda boxes

implicating just that sort of barred activity (*Id*., ¶¶127, 129). And though he contended, again

coincident with his general claim of having always adhered to plaintiff's work restrictions, that

he had never compelled her to engage in any activity involving repetitive motion, Upia flatly

contradicted this in writing, announcing in a February 2014 email to a host of Staples officials,

including Harrison, Barchi and Steve Oberholtzer, the Montgomery facility's General Manager,

that "Araminta Roa is currently on Light duty… She was making soda boxes today and felt pain

on multiple body parts *due to repetitive motion*." (*Id*., ¶¶130-132)(emphasis added). Also,

subsequent to their imposition, Upia continued to require plaintiff to lift weights beyond the

limits her doctors had placed upon her, in the form of objects such as furniture, empty pallets,

---

[9] Even more to the point, when subsequently present with plaintiff in the Montgomery Health Office, Upia effectively owned up to this lie, indicating, when advised by the facility's nurse that plaintiff was precluded from operating machinery due to the effects of her medication, that it was something he already knew: "Yeah, I know, I know." (*Id*., ¶120). Yet, Upia denies ever flouting plaintiff's work restrictions in general, and doing so by having her operate machinery in particular (*Id*., ¶122).

[10] When not being forced impermissibly by Upia to drive the electric pallet jack, plaintiff utilized instead a manual pallet jack (*Id*., ¶124). And needless to say, her being largely confined to the manual pallet jack as her means for transporting the goods she picked to fill customer orders, while all her fellow Bulk-Department workers accomplished their picking tasks via the far faster electric pallet jack, necessarily decreased her picking productivity, inasmuch as it inherently took her considerably more time than her coworkers to execute this aspect of her picking responsibilities physically rather than mechanically (*Id*.,¶125). Similarly, that plaintiff was on very strong medication that affected her concentration immanently undermined her productivity as well (*Id*., ¶126).

very large boxes full of calendars she had packed, and other boxes so heavy they required the

help of another worker just to get them off the ground (*Id.*, ¶¶133, 134).[11]

Nevertheless, driven by the need to preserve her employment with Staples and enabled to

a certain degree by her painkilling medications and help from her coworkers, plaintiff persevered

in the face of Upia's utter contempt for her accommodations and undertook whatever work he

assigned her (*Id.*, ¶¶136, 137). Along the way, however, in or about September 2014, plaintiff

sought permanent relief from Upia's ongoing abuse of her restrictions by requesting of him, in

accordance with her physicians' longstanding recommendations of such, a transfer to another,

less physically onerous department, namely Production, wherein she had formerly worked (*Id.*,

¶¶63, 139; *see also* n. 1, *supra*). Yet, Upia refused to grant her this most sensible and effective

accommodation of all, because, as he told her, it would entail too much work on his part to do so,

and no one else at Staples ever made any effort to transfer her from the Bulk Department to

another unit whose work was more consonant with her restrictions (Pl. 56.1 Stmt., ¶140).[12]

**B.**   **Plaintiff's Termination**

Plaintiff's sister and fellow Staples-Montgomery employee, Lila Sanchez ("Sanchez"),

would every workday bring, with her own lunch, one for plaintiff, each comprised of some lunch

food, a bag of chips and a drink that was almost always Arizona Iced Tea, and leave it for

plaintiff in the large refrigerator in the employees' cafeteria (*Id.*,¶¶145-147). Sanchez invariably

---

[11] Yet, as always, per Upia, he never defied any of plaintiff's restrictions, including her weight limits (*Id.*, ¶135).

[12] Assisting Upia in his management of the Bulk Department as "leads" were a pair of plaintiff's coworkers, and also in or about September 2014 plaintiff approached the two of them – both of whom were aware of her being made regularly by Upia, as a means of addressing the pressure upon him to meet the department's productivity objectives, to perform work beyond the scope of her restrictions – about engineering for her a transfer to the less physically strenuous Production Department (*Id.*, ¶¶141-143). The leads agreed to speak to that end, on her behalf, to the Production Department supervisor, and did in fact do so, only to report back to her that the supervisor had replied that, in order to consummate such a transfer, plaintiff would have to arrange with her own supervisor to effect it – a dead end, of course, inasmuch as Upia had already refused to do anything of the sort (*Id.*, ¶¶139, 140, 144).

packed her and plaintiff's lunches in white plastic supermarket bags, and these bags were among many white plastic supermarket bags stowed by employees in the cafeteria refrigerator (*Id.*, ¶148). The Montgomery facility was watched over at all times by a raft of security cameras throughout it, including one – Camera 88 – trained directly upon that refrigerator (*Id.*, ¶149).

As allegedly recorded by Camera 88, at 11:58 PM on July 8, 2015, Montgomery employee Willie Carley ("Carley") stored a white plastic bag in that same refrigerator, a bag from which Carley would report the following day a bag of chips stolen (*Id.*, ¶150). Carley's complaint was lodged with Loss Prevention Associate Paul Dowd ("Dowd"), and in response to it Dowd reviewed video retrieved from Camera 88, beginning that review from the point on the tape at which Carley allegedly deposited his bag in the refrigerator, logically and necessarily in order to determine which of the many bags in the refrigerator was in fact his and thus the one potentially later lightened of its chips (*Id.*, ¶151). Understanding that people can be mistaken about such things, upon receiving Carley's grievance, Dowd did not automatically credit it, but instead sought to verify it by investigation – yet, admittedly, never during the course of his ensuing inquiry did Dowd substantiate even the most fundamental element thereof: that Carley's bag ever contained any chips (*Id.*, ¶¶152, 153). Nor accordingly were Dowd, or his supervisor, Loss Prevention/Safety Manager Dennis Salvucci ("Salvucci"), or Barchi, both of whom also reviewed the relevant footage, able ever to conclusively establish that plaintiff, who would be convicted of the offense, in fact removed a pack of chips from Carley's bag – or indeed that she had actually removed from it anything at all (*Id.*, ¶154).[13] All any of them could say with

---

[13] And yet, though conceding, after watching that video, "can I say what [plaintiff's] hand is doing inside the bag, *no*," and that as such she could only "*assum[e]* [plaintiff is] grabbing a bag of chips," Barchi had utterly no compunction about *categorically* (and hence dishonestly) declaring, respectively, in plaintiff's termination notice and in a filing with the New York State Department of Labor in connection with plaintiff's application for unemployment insurance that plaintiff "removed the bag of chips out of the associate's lunch bag"; and that plaintiff "stole a bag of chips from an associate and upon investigation, we saw video of Araminta taking the chips," "video show[ing] her removing chips from associate's lunch bag." (*Id.*, ¶¶155-157)(emphasis added). Nor then did she

anything approaching certainty about plaintiff's conduct in connection with this matter was that, fourteen minutes after Carley supposedly set his white plastic bag in the cafeteria refrigerator, plaintiff opened the refrigerator and searched through some of the bags therein, paying special attention to the drinks inside them[14] – inasmuch as all they could venture about her actions thereafter was nothing more than unsubstantiated surmise and rank speculation. (*Id*., ¶159).

After conducting his admittedly inconclusive review of the footage, Dowd flagged that portion of it showing plaintiff, thereby saving it to a separate database on defendants' system and preserving it beyond the 20-30-day period that security video would ordinarily be maintained on the system before being automatically erased (*Id*., ¶163).[15] Yet, Dowd claimed to have failed to do the same for the earlier segment of the video purportedly recording Carley leaving his bag in the refrigerator – this, despite, again, his conceding its indispensability to establishing which bag was Carley's, and thus that the bag plaintiff was accused of thieving from was actually that same bag – and whether that segment was thereafter automatically deleted from defendants' system after 20 or 30 days or suffered some other fate, it indisputably has never been produced in these proceedings (*Id*., ¶164). Whatever its disposition, both Salvucci and Dowd, each experienced

---

[footnote] hesitate either when discharging plaintiff to pronounce plaintiff unequivocally the perpetrator, advising plaintiff that "the cameras showed that [she] had gotten in and dug through the bag and took the chips out." (*Id*., ¶158).

[14] Which squares fully with plaintiff's account that, with so many other white plastic bags in the cooler, she looked hurriedly through a number of them – as she had a ride awaiting her – in search of the iced tea that was always in the lunches Sanchez left her in order to determine which in fact was the bag her sister had left for her (*Id*., ¶160).

[15] Acknowledging more than once the poor quality of the video (*e.g*., "the footage isn't good enough" to establish plaintiff as taking something from Carley's bag), Dowd uniformly describes those actions subsequent to plaintiff's above-described rummaging equivocally, stating that "it *appears* that [plaintiff] places her hand inside [Carley's] bag"; that plaintiff "*appears* to reach inside his bag and pull something out"; and that whatever that something was "*appears* to be clasped and covered with a forearm," and was at best only that: a something, unidentified as anything specifically, let alone as a bag of chips (plaintiff "removes something" from the bag) (*Id*., ¶161)(emphasis added). Staples stresses that "Salvucci and Barchi viewed the video… multiple times" (Def. Mem., at 16), as if this underscores the validity of their conclusions as to it, when of course it shows just the opposite – that the video was so incredibly poor that even repeated viewings could not cure the doubts they, and Dowd, had as to what it depicted.

theft investigators, acknowledged that, given its above-discussed indispensability, that portion of the video was highly salient and thus should properly have been maintained (*Id*., ¶165).[16]

Pursuant to Loss-Prevention theft-investigation procedure, after his initial review of the video, Dowd forwarded that video and his "findings" based thereon to Salvucci, who was from there to conduct his own, more comprehensive investigation, which, per protocol in instances of suspected theft, dictated not only his own review of the video at issue, but further information-gathering, primarily via interviews of knowledgeable witnesses, starting with the accuser and the accused, since that is the only way, he stated, to get "both sides of the story… surrounding the case," and hence "a complete picture of what happened," and as such "the fairest way to conduct an investigation." (*Id*., ¶¶169, 170).[17] And while Salvucci claims to have indeed debriefed plaintiff on the matter (*Id*., ¶172), his own account of this "interview" and the circumstances allegedly surrounding it – beginning with his admitted uncertainty as to whether he ever *did* in fact conduct any such interview with plaintiff; and, if he did, whether it even occurred prior to the decision to fire her for theft (*Id*., ¶173) – and other evidence bearing thereupon clearly show the claim to be a fabrication. In the first place, according to Salvucci, accepted investigatory practice mandated that plaintiff's supervisor, Upia, be present during the interview, and that he was indeed there for the purported grilling of plaintiff (*Id*., ¶174). Yet, Salvucci in virtually the

---

[16] Dowd contended that it was standard Loss-Prevention practice and Salvucci's express directive in instances such as this to flag and save only that section of the applicable video portraying the actual alleged wrongful act, *e.g*., in this case, plaintiff's reputed theft of Carley's "chips," and thereby leave it to the discretion of Salvucci to preserve thereafter any other portions of the film he believed warranting such (*Id*., ¶166). However, if that were so, one would readily expect Salvucci to be fully aware of the existence of both such a practice in the department he leads and his own personal instruction in that regard, and accordingly cite them when asked why the Carley segment of the tape was not preserved, and yet not only did he fail to do that, but he professed even more contrarily utter ignorance as to why that segment had not been saved, when it admittedly should have been (*Id*., ¶167). Not surprisingly then, Dowd subsequently reversed course and conceded that it *was* common practice in the department in fact to preserve *all parts* of a video bearing upon an incident like this, and hence, in this instance, the Carley part (*Id*., ¶168).

[17] After reviewing the video, Salvucci plainly agreed with Dowd that it was inconclusive, inasmuch as he instructed Dowd then to check the footage from *other* cameras in the vicinity of the refrigerator to see if "[m]aybe we can get something there," an effort that yielded no more concrete proof as to plaintiff's alleged culpability (*Id*., ¶171).

same breath conceded that he did not know if he had actually ever contacted Upia about the interview, and Upia himself testified that he only became aware of this entire matter just a few hours before accompanying plaintiff to Barchi's office for the termination meeting, when Salvucci apprised him of the coming discharge, yet without ever informing Upia of the specific grounds therefor, stating only and cryptically that there had been "an incident with Araminta." (*Id*., ¶¶175, 176). Similarly, although Salvucci claimed to have conveyed the substance of his "interview" of plaintiff to Human Resources, and likely to Barchi, Barchi disclaimed that any interview of plaintiff had been conducted, by Salvucci or anyone else, and instead described the entirety of the "investigation" into the "chips" "theft" as having solely comprised discussion with the complainant and review of the video – and indeed Salvucci himself testified, as Barchi did, to his *not* having had any communications with Human Resources about plaintiff leading up to her dismissal (*Id*., ¶¶177-179). All of which is wholly consistent with plaintiff's position that the first and only time the theft allegation was ever raised with her was at the moment of her dismissal allegedly on the basis of it (*Id*., ¶179a). Further, whereas Barchi recounted plaintiff's reaction to the theft accusation as having been "very argumentative," "very loud," "irate" and "angry" as she vociferously disputed it on the grounds that the only chips she had taken from the refrigerator had been the ones left there for her by her sister, according to Salvucci, when he leveled the exact same allegation at her in his "interview," plaintiff remained completely mute and emotionless, with her only affirmative response having been a meek nod of the head in reply to his asking her if she had taken chips from the refrigerator (*Id*.,¶¶180, 181). And though he cited as the very purposes for conducting interviews in these sorts of investigations, and of the accused especially, a need to get "both sides of the story" and basic "fair[ness]," even if Salvucci *had* interviewed plaintiff, that he never, in his telling, asked her during that "interview" for her "side

of the story," but instead simply and abruptly concluded the "session" at the above-referenced "nod," would have demonstrated a total negation of the very self-stated reasons he was allegedly interviewing her in the first place, as he indeed conceded by his admission that to have foreclosed plaintiff an opportunity to explain herself was improper,[18] a view in which Dowd concurred (*Id*., ¶¶182, 185, 186, 186b).[19] Yet, even though it is undisputed that, interview or no interview, plaintiff had never been afforded such an opportunity, Lee, who, in consultation with Barchi and Salvucci, approved their recommendation that plaintiff be discharged, contended that the two of them had assured her that plaintiff *had* in fact been given such a chance, which Lee agreed plaintiff was absolutely due, in particular by these two, inasmuch as it was their duty to "[i]nvestigate [the matter] for the purpose of coming up with the truth," and as there was no reason plaintiff had to be terminated until they had "look[ed] into her side of the story." (*Id*., ¶¶187-195). Lee, Salvucci and Dowd also all admitted that, given plaintiff's assertion that she had not stolen Carley's chips, but had rightfully taken the chips left for her by her sister, Sanchez should have been interviewed as well, yet she was not spoken to either (*Id*., ¶196). Lee could not, in light of the foregoing circumstances, vouch for the fairness of plaintiff's discharge, and in fact went even further, admitting that, even if plaintiff *had* taken Carley's "chips," had she done so – as was possible – believing them to have been the chips Sanchez had left for her, "that would be

---

[18] Indeed, Salvucci acknowledged as well that this "nod" merely signified plaintiff's agreement that she had taken chips from the refrigerator, and as such was not inconsistent with her assertion in her own defense that those chips had been hers, such that he should have followed up and clarified the meaning of the "nod." (*Id*., ¶¶183, 184).

[19] Staples tacitly concedes that Salvucci invented his alleged interview with plaintiff, inasmuch as its account in its Local Rule 56.1 Statement of the entirety of Salvucci's actions taken in connection with the investigation of the theft allegation against plaintiff omits any mention at all of his having conducted an interview with her on the subject:

> After reviewing the email and video and agreeing with Dowd's conclusion that Roa likely was the culprit, Salvucci forwarded the information to Human Resources to take appropriate action. (Def. L.R. 56.1 Stmt., ¶27 (citing Salvucci Dep. at 17:24-18:5, 18:22-19:4, 19:10-14, 21:6-22, 23:10-25; Benson Decl. Ex. M)).

a mistake and that would not be theft." (*Id.*, ¶¶197, 198).[20] It was the obligation of Barchi and Salvucci, Lee continued, to determine whether such was in fact the case (*Id.*, ¶199). Yet, again, to do so, it was necessary for them to have explored the matter with plaintiff and Sanchez, and, again too, they indefensibly did neither (*Id.*, ¶¶182, 185, 186, 186b, 191-193, 196, 203).

**ARGUMENT**
**AMPLE EVIDENCE EXISTS TO FORESTALL SUMMARY JUDGMENT**

### A.    Plaintiff Establishes a Prima Facie Case of Disability Discrimination

Disability discrimination claims pressed under both the Americans With Disabilities Act ("ADA") and the New York State Human Rights Law ("NYSHRL") are analyzed according to the burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-5 (1973),[21] pursuant to which a plaintiff must first "establish a prima facie case [by] show[ing]… that: (1) h[er] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of h[er] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of h[er] disability." <u>Sista v. CDC Ixis N. Am., Inc.</u>, 445 F.3d 161, 169 (2d Cir. 2006)(alterations added). Defendants do not challenge, and thereby concede, plaintiff's satisfaction of the first two of these elements (*See* Def. Mem., at 5-6).[22]

### 1.    Plaintiff Meets the Third Element of Her Prima Facie Case

Per the Second Circuit, "[e]vidence of whether a particular job duty constitutes an essential function includes, *inter alia*, 'the employer's judgment as to what functions of a job are

---

[20] Which is at the very least what occurred, for, though plaintiff was adamant that she took the chips left for her, she did concede that the medications she was on at the time for her injuries muddled her mental state and undermined her concentration, such that she could have been vulnerable to making such an error (*Id.*, ¶¶201, 202).

[21] *See* <u>Katz v. Adecco USA, Inc.</u>, 845 F.Supp.2d 539, 547 (S.D.N.Y. 2012).

[22] *See* <u>Punter v. City of New York</u>, 2005 WL 2095733, at *7 (E.D.N.Y. Aug. 30, 2005).

essential' and 'a written description.'" <u>McBride v. BIC Consumer Prods Mfg. Co.</u>, 583 F.3d 92, 98 (2d Cir. 2009)(quoting 42 U.S.C. §12111(8); also citing 29 C.F.R. §1630.2(n)(3)). Defendants contend that plaintiff fails to establish this prong of her prima facie case because she could not lift or move "significant amounts of weight" or operate machinery, and offer as "proof" of this her own testimony and the written description for her job. (Def. Mem., at 6-7). Yet, first off, Staples wholly misrepresents plaintiff's testimony on this score. In stating that her impairments "prevented her from performing all of the essential functions of her job," plaintiff was alluding *only* to when she was first diagnosed with those conditions in 2013, and thus *before* she was regularly taking palliative medications therefor, and indeed thereafter, throughout her testimony, she made clear repeatedly and consistently that, by virtue of those medications, as well as certain accommodations granted her in consideration of her conditions, the occasional aid of her coworkers and sheer will, she *was* able to perform *all* the work she was assigned, and hence the essential functions of her Bulk Picker position (Pl. 56.1 Stmt., ¶¶6(a), (b)) – testimony that, as discussed below, is corroborated fully by Upia.[23] As for the written description, initially it must be noted that, when it comes to assessing the actual attributes of a job, the Supreme Court has looked decidedly askance at such descriptions, declaring that "[f]ormal job descriptions often bear little resemblance to the duties an employee is actually expected to perform," such that "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 424-425 (2006). And this strong caution is of

---

[23] Defendants also disingenuously assert that "Roa herself acknowledged the essential nature of operating heavy machinery and lifting, pushing and pulling significant amounts of weight as part of her job duties" (Def. Mem., at 6-7), as shown by their supporting this claim by citation to ¶5 of their Local Rule 56.1 Statement, which paragraph in turn cites not to any testimony of plaintiff at all, let alone to this specific effect, but only to the job description.

particular moment herein, where, whatever the Bulk Picker description might say about the components of that job,[24] Upia, plaintiff's supervisor in that job and clearly as such in the best, real-world position to know what was essential to her performance of that job, proclaimed categorically and persistently that, even physically afflicted and medically restricted, plaintiff was nonetheless fully capable of performing just as much bulk-picking work as her coworkers in that role, assurances that he logically could never have made had plaintiff been unable to perform a swath of the job's essential functions (Pl. 56.1 Stmt., ¶¶84-90a).[25] Given that "the identification of the essential functions of a job requires a fact-specific inquiry into" not only "the employer's description of a job," but "how the job is actually performed in practice," <u>Borkowski v. Valley Cent. Sch. Dist.</u>, 63 F.3d 131, 140 (2d Cir. 1995); <u>Welch v. UPS, Inc.</u>, 871 F.Supp.2d 164, 186 (E.D.N.Y 2012)("Determining whether physical qualifications are essential functions of a job… should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved."); that "a court must give substantial deference to an employer's judgment as to whether a function is essential to the proper performance of a job," <u>McBride</u>, 583 F.3d at 98; and that, unquestionably, the judgment

---

[24] And indeed what it does say is not what defendants claim it to say. The only reference to "essential functions" therein is in conjunction with the section thereof entitled: "Physical Demands," in which there is no mention at all of machinery-operation, and the matter of "lift[ing], push[ing] or pull[ing]" objects is not framed definitively, but only potentially: "Employee <em>may</em> lift, push or pull boxes/merchandise weighing between 70 pounds and 100 pounds." (Bernbach Dec., Ex. 13)(emphasis added). Accordingly, the job description in fact, by its own terms, characterizes neither machinery-operation nor any particular magnitude of weight conveyance as an essential function.

[25] This is hardly a shock, for one must not forget the "essence" at the root of the term "essential functions," and that here, manifestly, the essence of the Bulk-Picker position is indeed the bulk-picking, and, in reliance upon her medications, the periodic assistance of coworkers, the use of the manual pallet jack in place of its electric counterpart and her own inner fortitude, plaintiff, as confirmed by Upia, did in fact execute the picking. How well she may have done it in Upia's view is another matter entirely from that of whether she was simply capable of performing it, per the well-established principle that, in order for one to establish her qualification for a position, "she must show only that she 'possesses the basic skills necessary for performance of [the] job,'" <u>Emmanuel v. Cushman & Wakefield, Inc.</u>, 2015 WL 5036970, at *4 (S.D.N.Y Aug. 26, 2015)(quoting <u>Slattery v. Swiss Reins. Am. Corp.</u>, 248 F.3d 87, 92 (2d Cir. 2001)), and its corollary "cautioning courts against conflating 'qualified for the position' with 'performing... duties satisfactorily,'" <u>Emmanuel</u>, <em>supra</em> (quoting <u>Slattery</u>, <em>supra</em>, at 91).

of this employer resides most meaningfully in its own appointed supervisor of its Bulk Pickers in general and of plaintiff in particular, Upia's views on this score wholly refute Staples' assertions to the contrary. *See* Henchey v. Town of N. Greenbush, 831 F.Supp. 960, 966 (N.D.N.Y 1993).[26]

Moreover, as "[i]t is well established that under the ADA, the employer's duty to reasonably accommodate a disabled employee includes reassignment of the employee to a vacant position for which she is qualified," Felix v. NYC Transit Auth., 154 F.Supp.2d 640, 655 (S.D.N.Y 2001), even if plaintiff here were not so clearly otherwise qualified for her Bulk Picker job on the above grounds, that defendants could have accommodated her by simply transferring her from the Bulk Department to an open job in the far less physically demanding Production Department – both as recommended by her doctors and as specifically requested by her – but did not do so for only the most inexcusable of reasons, *i.e.*, Upia's having been too lazy to arrange it, not only affords an alternate means by which she meets this prima facie burden, but in fact stands squarely as a violation of the ADA in its own right, Norville v. Staten Isl. Univ. Hosp., 196 F.3d 89, 99 (2d Cir. 1999)("[W]here a comparable position is vacant and the disabled employee is qualified for [it], an employer's refusal to reassign the employee to that position – absent some other offer of reasonable accommodation – constitutes a violation of the ADA.").[27]

---

[26] In Henchey, summary judgment was denied on the matter of "whether 'heavy lifting' is in fact an essential function of the [plaintiff's] laborer position," even though "the job description provides that a laborer must have the 'ability to lift heavy weights,' be in 'good physical condition' and have 'physical endurance,'" where the plaintiff's supervisor, for whom the plaintiff had performed the job on light duty, confirmed that, despite being unable to engage in heavy lifting, the plaintiff had been able to perform his job. *Id*., at 963, 966 (alteration added).

[27] That, on plaintiff's behalf, the two Bulk-Department leads requested such a transfer of the head of the Production Department and were told that Upia would have to effect such for it to occur clearly demonstrates that there was in fact an available Picker position in that unit to which she could have been transferred – otherwise, of course, Upia would not have been called upon to do anything in this connection – for which she, by virtue of having, for a number of years prior, held and performed the position of Production Picker (Pl. 56.1 Stmt., ¶63), was qualified. Thompson v. Am. Eagle Airlines, Inc., 2000 WL 1505972, at *4 (S.D.N.Y. Oct. 6, 2000). And needless to say, since Upia refused to honor the accommodations offered by Staples, they were not, as a practical matter, offered at all, and thus functionally were, per the prescription set forth in Norville, *supra*, "absent."

### 2.  Plaintiff Meets the Fourth Element of Her Prima Facie Case

In accord with the well-settled principle that the evidence required to make out the prima

facie case in general is "de minimis," <u>Bush v. Fordham Univ.</u>, 452 F.Supp.2d 394, 407 (S.D.N.Y

2006), all that a plaintiff need do in order to meet the fourth prong thereof is show that she was

replaced by an individual outside the protected class, <u>Zimmerman v. Assocs. First Cap. Corp.</u>,

251 F.3d 376, 381(2d Cir. 2001), or specifically in this type of case, by a non-disabled person,

<u>Costello v. St. Francis Hosp.</u>, 258 F.Supp.2d 144, 154 (E.D.N.Y. 2003), and this she has done,

via Upia's testimony that Staples did just that following her discharge (Pl. 56.1 Stmt., ¶204).

### a.  Defendants' Theft "Investigation" Was a Demonstrable Sham

Even though such is wholly sufficient to close the book on this particular prima facie

component, as there are numerous alternate means by which to accomplish such, including by

way of proof of "the sequence of events leading to the plaintiff's discharge," <u>Abdu–Brisson v.</u>

<u>Delta Air Lines, Inc.</u>, 239 F.3d 456, 468 (2d Cir. 2001),[28] that that sequence herein features (a) a

theft accusation against this plaintiff that, despite defendants' evincible misrepresentations to the

contrary, was never substantiated;[29] (b) an "investigation" into that accusation that admittedly

---

[28] With there being manifold avenues by which to satisfy the fourth prima facie branch, a plaintiff is in no way required to do so by way of evidence of disparate treatment, <u>Id</u>., such that defendants' taking plaintiff to task herein for not having proffered such evidence (Def. Mem., at 11-12) is entirely and knowingly a feint.

[29] In representing to the Court herein that the video stands as "irrefutable evidence… that [plaintiff] took the chips from Carley's lunch bag" (Def. Mem., at 15), when as shown above each of the video-viewing witnesses expressly conceded – based upon their *own respective reviews of the video*, and *not* upon the equivocations in Dowd's email about it, as defendants falsely claim (<u>Id</u>.) – that the video was *not* conclusive, and thus *by definition not* irrefutable, even just on the matter of whether plaintiff removed anything at all from Carley's bag, much less his "chips," Staples is in fact *mis*representing to the Court, which should accordingly reject this assertion out of hand. <u>Risco v.</u> <u>McHugh</u>, 868 F.Supp.2d 75, 86 n. 2 (S.D.N.Y. 2012)(Dismissing as "improper averments" "statements… that are explicitly contradicted by admissible evidence in the record (including [the averring witness's] prior sworn testimony"). Especially, again, when the supposedly "irrefutable" video is conveniently excised of that portion thereof allegedly establishing the admittedly vital fact that Carley's bag was the one into which plaintiff reached. <u>Rivera v. NYC Hous. Auth.</u>, 1998 WL 108032, at *1 (S.D.N.Y. March 11, 1998)("[A] party who fails to produce requested information should not benefit from the resulting gaps in the evidentiary record").

transgressed the applicable investigatory procedures, the ultimate decisionmaker's stated

expectations therefor, and plain logic and common sense;[30] (c) relevant witnesses left as a result

unjustifiably uninterviewed and highly pertinent questions of them inexcusably unasked, <u>Ross v.</u>

<u>IBM Corp.</u>, 2006 WL 197137, at *9 (D. Vt. Jan. 24, 2006)(Among facts that "could permit a jury

to infer that [defendant's] investigation was insufficiently thorough and that its decision was

arbitrary or pretextual" was that its investigator "failed to interview certain key individuals"); (d)

the primary investigator's demonstrable lie about interviewing one of those witnesses;[31] (e) a

blind eye thus willfully turned by Staples to readily attainable evidence that, upon its adduction,

would have, as expressly conceded by the ultimate decisionmaker, shown plaintiff not to have

committed a theft at all;[32] (e) an ultimate decisionmaker as a result of the foregoing unable to

---

[30] Interviewing knowledgeable witnesses; permitting the accused to offer her "side of the story"; engaging in evidence-gathering sufficient to yield "a complete picture of what happened"; preserving the essential, Carley segment of the video – all acknowledged by Salvucci, and corroborated by Dowd, to have been standard facets of Loss Prevention's theft-investigation procedure; all nonetheless dispensed with for no good reason in plaintiff's case; and all as such quintessential evidence of pretext. As "'departures from procedural regularity... can raise a question as to the good faith of the process where the departure may reasonably affect the decision,'" <u>Villar v. City of New York</u>, 135 F.Supp.2d 105, 125 (S.D.N.Y. 2015)(quoting <u>Stern v. Trustees of Columbia Univ.</u>, 131 F.3d 305, 313 (2d Cir. 1997)), and as Lee made clear that inquiry into plaintiff's assertion that she had taken chips her sister had left for her via interviews with plaintiff and her sister (that were already, as noted above, mandated by applicable procedure) could have established that plaintiff had taken Carley's "chips" in error and thereby vindicated her as to the theft charge, these otherwise unexplained grievous procedural lapses directly and indisputably "affect[ed] the decision" to fire plaintiff allegedly for theft, and thus indicate pretext most powerfully.

[31] That Salvucci concocted such a wholly transparent tale of having interviewed plaintiff was plainly for the means of endeavoring to at least partially cover up the fact that he had so miserably and unpardonably disregarded his own investigatory protocol, and should thus be taken as evidence of a guilty mind on his, and Staples', part. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147 (2000)(Discussing the "principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt"). Yet, of course, even lying in this way did not serve to ameliorate the violence Salvucci's flagrant investigatory omissions did to applicable procedure, for, even if he did interview plaintiff, in light of his admittedly improper failures (a) to follow up with her in the course thereof on the acknowledged possibility that she might have believed herself to have taken chips belonging to her, and (b) to interview Sanchez at all on that decisive question, he was still concededly in gross and otherwise inexplicable violation of that procedure.

[32] It has long been held in this circuit that "'[a]ctions taken by an employer that disadvantage an employee for no logical reason constitute strong evidence of an intent to discriminate,'" <u>Robinson v. Gucci Am.</u>, 2012 WL 259409, at *5 (S.D.N.Y. Jan. 27, 2012)(quoting <u>Stratton v. Dept. for the Aging</u>, 132 F.3d 869, 880 n. 6 (2d Cir. 1997)), and certainly that defendants herein flatly refused to inquire into plaintiff's admittedly potentially exonerative assertion that she had taken chips left for her by her sister by following the eminently logical and devastatingly easy course of questioning her and her Staples-Montgomery-employed sister on the subject – especially when such was admittedly mandated by Salvucci's standard investigatory procedure; when Lee conceded there had been no reason to fire

attest to the fairness of plaintiff's discharge; (f) an indefensible failure to preserve and/or produce

a piece of evidence upon which the theft accusation, the "investigation" thereinto and its putative

result all admittedly hinged;[33] and (g) all of this against the backdrop of clear disability animus

harbored and routinely acted upon by plaintiff's supervisor and known full well to the technical

decisionmakers – would serve only to underscore many times over that plaintiff's discharge

occurred under circumstances bespeaking discrimination. In <u>Raymond v. IBM Corp.</u>, 148 F.3d

63 (2d Cir. 1998), the Second Circuit held that, where an investigation claimed to have yielded

proof of the plaintiff's misconduct, and in turn grounds for her termination, was exposed as

having been compromised, it was likewise shown that the employer "could not… have had a

reasonable, good faith belief in the results of its investigation," and accordingly "lacked a

reasonable, good faith belief that plaintiff had engaged in misconduct," <i>Id</i>., at 67. And certainly

here, the investigation into the theft charge against plaintiff was permeated from beginning to

end with conduct on the part of the Staples actors involved so beyond the pale of what virtually

all of them admitted was proper, expected and required under the circumstances that the only

rational conclusion to be drawn therefrom was that plaintiff's termination was a foregone

conclusion and defendants accordingly had no need nor desire then to determine whether she had

---

plaintiff without first doing so; and when Lee also could not, in light of the failure to do so, affirm the fairness of plaintiff's discharge – demonstrates that Staples engaged in just such discrimination-indicative actions.

[33] "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." <u>Fujitsu Ltd. v. Fed. Express Corp.</u>, 247 F.3d 423, 436 (2d Cir. 2001), and while perhaps that plaintiff would sue it for discrimination was not apparent to Staples at and about the time of her dismissal, for certain it had to have anticipated both (a) that plaintiff would seek unemployment benefits as a consequence of that discharge – indeed, Barchi specifically advised plaintiff of her right to do so during the termination meeting (Pl. 56.1 Stmt., ¶50(b)) – and (b) that, given the misconduct-based reason therefor, Staples would oppose that application by her, thereby sparking litigation (<i>Id</i>., ¶202), to which the video at issue herein – including the admittedly crucial Carley section thereof – would surely be central. Staples should thus have preserved the video in its entirety, and not only for this litigation-related purpose, but pursuant to its own acknowledged practices, yet purportedly did not. As "[a]dverse inferences might… be drawn from failure to produce evidence within the control of a party," <u>Bogan v. Northwestern Mut. Life Ins. Co.</u>, 144 F.R.D. 51, 55 (S.D.N.Y 1992), under these most egregious circumstances, such an inference should be drawn against Staples.

in fact stolen Carley's "chips." <u>Ibrahim v. New York State Dept. of Health</u>, 904 F.2d 161, 168

(2d Cir. 1990)("Those who can demonstrate no legitimate reason for acting more likely than not

acted for a discriminatory reason."). Indeed, if discrimination is not considered the cause, those

individuals' actions herein – whereby, when apprised of a potentially exculpatory reason for

plaintiff's having putatively taken the chips, instead of undertaking the very simplest of steps to

explore the veracity of that reason and determine then whether a theft-based termination was in

fact truly in order, they heedlessly barreled ahead with that termination – would be wholly

irrational, which of course *does* point right to discrimination as the cause. <u>Shafrir v. Ass'n of</u>

<u>Reform Zionists of America,</u> 998 F.Supp. 355, 362 (S.D.N.Y. 1998)(That "[a] reasonable jury

could find that defendants' decision to fire plaintiff was irrational" bespeaks discrimination).[34]

Since a defendant seeking summary judgment on the basis of an investigation purporting to have

ascertained that the plaintiff had engaged in terminable misconduct in fact "is *not* entitled to

summary judgment as long as there is an issue of material fact as to whether 'the factual basis on

which the employer concluded a dischargeable act had been committed [was] reached honestly,

after an appropriate investigation and for reasons that are not arbitrary or pretextual,'" <u>Ross</u>,

*supra* (quoting <u>Cotran v. Rollins Hudig Hall Int'l, Inc.</u>, 948 P.2d 412, 422 (Cal. 1998))(alteration

---

[34] As a perfect illustration of just how untethered defendants are from the import of this evidence, they portray plaintiff's admission of having taken chips from the refrigerator as some sort of Perry Mason moment, letting the bold and underlined type fly as they wheel and level the accusing finger and cry that "Roa herself **does not dispute that she took the chips out of the refrigerator**." (Def. Mem., at 17)(emphases in original). Quite simply, so what? The issue determinative of the theft charge against plaintiff was not whether she took chips from the refrigerator, or even, as conceded by Lee, whether she took Carley's "chips" from the refrigerator, but rather, again per Lee, whether she took Carley's "chips" purposefully or in the mistaken belief that they were the ones left for her by her sister, since in only the first scenario would she be guilty of theft. Indeed, defendants go right on in the attendant parenthetical to note: "though she contends she thought she was taking chips her sister had left for her and may not have been aware of what [she] was doing due to her 'drunken-like state'" (*Id*.), apparently clueless that, if that were indeed the case – which admittedly should have been determined by Staples' investigators – then, according to Lee, **she could not and would not have committed a theft at all**. Even more fundamentally, that plaintiff admits having taken chips from the refrigerator does not resolve whatsoever whether she even took them in the first place from *Carley's bag*, a matter on which, of course, thanks to their having improperly either deleted or deep-sixed that span of the video necessary to establish which bag was Carley's, defendants have proffered no credible proof at all.

in original; emphasis added), that there is here not merely an issue of fact as to the honesty of the verdict rendered against plaintiff, the appropriateness of the investigation producing it and in turn the pretextuality of the articulated reason for her termination, but an essentially settled record as to those matters, inasmuch as the facts comprising it are drawn from a range of admissions from Staples' own witnesses, demonstrates conclusively the impropriety of the relief it demands.[35]

None of the foregoing is altered by Staples' argument that the reputed firings of certain of its employees found guilty of theft indicate that plaintiff was treated nondiscriminatorily (Def. Mem., at 11-12), for, in order to establish the very premise thereof, Staples must prove that plaintiff actually committed a theft, yet, as shown above, this it has resoundingly failed to do, not least by Lee's admission that, had plaintiff's admittedly improperly ignored and uninvestigated belief that she had taken chips left for her by her sister been borne out, she would not have stolen even if she *had* taken Carley's "chips." Since these sorts of comparisons are only probative to the extent the putative comparators are similarly situated, meaning in this context that "the conduct for which the employer imposed discipline was of comparable seriousness," Graham v. LIRR, 230 F.3d 34, 40 (2d Cir. 2000), that defendants cannot show plaintiff to have engaged in the subject conduct *at all* vitiates instantly any validity of this "comparison."[36]

---

[35] Though manifest from the issues plaintiff raises with respect to the "investigation" into the theft charge against her, it bears emphasizing, in light of their willful distortion by Staples, that they are absolutely *not* mere plaints that the investigation was simply incomplete or that it reached an erroneous conclusion, as defendants dishonestly claim (Def. Mem., at 16), but rather are in the nature of an indictment of the investigation as an utter sham, or in other words an attack upon not its competence, but its integrity. As such, plaintiff has never contended that it should have been "conducted with the same unerring search for truth that goes into a criminal investigation," as fantasized by defendants (Def. Mem., at 15). To the contrary, she asserts that it should have been conducted in accordance with governing company procedure, the stated expectations of the ultimate decisionmaker, and logic, common sense and basic fairness, none of which pillars of legitimacy admittedly was even remotely vindicated by the one actually undertaken, thereby distinguishing this case from those cited by defendants on this issue, Alexiadis v. New York College of Health Professionals, 891 F.Supp.2d 418, 431-432 (E.D.N.Y. 2012); Sharpe v. Utica Mut. Ins. Co., 756 F.Supp.2d 230, 249-251 (N.D.N.Y. 2010), neither of which involved such a panoply of stark and elemental failings.

[36] As does the fact that, while "the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparators' cases," *Id.*, here, defendants have refused to comply with plaintiff's discovery requests seeking information as to just those "facts and circumstances," and thus proffer no

### b. **Upia's Disability Animus Poisoned the Well**

It is axiomatic that "[d]iscrimination in violation of the ADA includes, *inter alia*, 'not making reasonable accommodations to the known physical… limitations of an otherwise qualified individual with a disability,'" McBride, 583 F.3d at 97 (quoting 42 U.S.C. §12111(9)(B)), and while Staples may have administratively granted plaintiff's accommodations, Upia was unwilling in practice to abide by them, on account of a hostility toward her disabilities, their relegation of her to an extended period of light duty and the adverse impact he viewed their thus having upon the productivity of his department that he consistently displayed in the form of everything from disdainful remarks and looks to those regular outright violations of her accommodations, Esposito v. Donahoe, 2015 WL 5561287, at *5 (E.D.N.Y. 2015)(A plaintiff's being "requir[ed]… to perform work beyond his restrictions is so related to his disability that one may fairly infer a discriminatory animus on those facts alone");[37] Lewis v. Blackman Plumbing Supply, LLC, 51 F.Supp.3d 289, 302 (S.D.N.Y. 2014)(Supervisor's "negative comments about [plaintiff's] disability in relation to his work performance" show disability bias); Petrosky v. NYS Dept. of Motor Vehicles, 72 F.Supp.2d 39, 60 (N.D.N.Y. 1999)(Supervisors' upset over workplace disruptions wrought by plaintiff's accommodations evidence of disability animus). Plainly then, defendants' contention that plaintiff roots her proof of Upia's disability animus solely in the facts of her stay on light duty for a duration beyond the company norm and his statement to her professing shock at just how long that stay had been (Def. Mem., at 10) is false. Equally spurious is Staples' claim that Upia's expression of shock as to the length of plaintiff's

---

such information now (*See* Pl. 56.1 Stmt., ¶61). Rivera, *supra*. Indeed, as a result of this, it is entirely unknown whether the decisionmakers behind plaintiff's discharge were also behind those of these "other" thieves, yet another fatal blow. Jeunes v. Potter, 2009 WL 2883060, at *11 (D. Conn. Sept. 3, 2009) ("[T]o be similarly situated, a [comparator] must have been treated more favorably by the same decisionmaker that fired the [plaintiff]."

[37] *Cf.* Grana v. Potter, 2009 WL 425913, *8, 11 (E.D.N.Y. Feb. 19, 2009)(Assignment of work in excess of disabled plaintiff's medical restrictions probative of retaliatory intent).

term on light duty – which is, both on its own terms and clearly in the context of those incessant infringements upon her restrictions, reflective of his disenchantment with plaintiff's disabilities and accommodations – lacks relevance on account of its alleged remoteness from the discharge decision (*Id*.). In the first place, when "other indicia of discrimination are properly presented," purported "stray remarks" "can no longer be deemed [such] and the jury has a right to conclude that they bear a more ominous significance," Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998), so that, even if Staples' characterization of this comment as "stray" had some short-term appeal, in the end, given the wealth of above-analyzed evidence of pretext deriving from the theft "investigation," with which Upia's comment is coupled in plaintiff's inventory of proof, it would still stand as relevant evidence. Even so, the remark is utterly *not* "stray" in the first place, for, as noted above, it is certainly evincive of disability animus on Upia's part, and that it was made during the time that Upia was acting against plaintiff in other ways demonstrative of that animus, most prominently and prevalently by incessantly contravening her work restrictions, establishes its relevance notwithstanding any superficial disconnect from the adverse decision. Bacchus v. NYC Dept. of Educ., 137 F.Supp.3d 214, 224, 230, 238 (E.D.N.Y. 2015)(Biased statements made by superior during the two years preceding plaintiff's discharge "more than stray remarks" given their coincidence with a series of discriminatory actions taken against her during that period). All of the foregoing may obviously be said as well about Upia's even more patent betrayal of frustration and lost patience with plaintiff's disabilities and accommodations in his demanding of Lee, in the same breath as his request of her for leave to commence formal discipline against plaintiff: "Do we know how long bulk has to accommodate Araminta Roa?"[38]

---

[38] Defendants tellingly do not seek to marginalize this remark on the basis of any alleged strayness – a gambit that would, as demonstrated above, have failed even if they had attempted it – but instead endeavor to explain it away as Upia did as merely an innocent request for information (Def. Mem., at 17), a claim that, as plaintiff shows in her Local Rule 56.1 Statement, is in fact a confused mess that does not withstand scrutiny (*See* Pl. 56.1 Stmt., ¶44).

Having failed to counter the ample proof of Upia's disability animus, defendants stumble

every bit as badly in attempting to insulate therefrom Lee and Barchi, the officials immediately

effecting plaintiff's discharge (Def. 9-11). It is well-settled both that the discriminatory bias of

"'individuals with substantial influence over [the plaintiff's] employment'" is "probative of

discrimination," Sethi v. Narod, 12 F.Supp.3d 505, 539 (E.D.N.Y. 2014)(quoting Owens v. NYC

Hous. Auth., 934 F.2d 405, 410 (2d Cir. 1991)), and that "a supervisor and decision-maker with

regard to Plaintiff's employment" generally is just such an individual, Sethi, *supra*. Accordingly,

"[i]f one of [the decisionmaker's] sources of information about [the plaintiff] was polluted by [ ]

bias, that might [have been] enough to poison the well from which the termination decision was

drawn even if [the decisionmaker] himself were wholly innocent of bias," Durling v. Uddo &

Assocs., 1993 WL 33645, at *3 (S.D.N.Y. Feb. 4, 1993)(alterations in original and added), and

indeed such has been found to be the case where a biased non-decisionmaker supervisor of the

plaintiff "conferred with" the decisionmaker as to "employees' performance" and in regard to

matters involving the plaintiff in particular, and was in fact "present at the time of the plaintiff's

termination," Azar v. TGI Friday's, Inc., 945 F.Supp. 485, 499 (E.D.N.Y. 1996).[39] And plainly,

the circumstances at play herein are even stronger on these points than in the cases cited therefor,

inasmuch as Upia did not merely discuss plaintiff or her performance with Lee, but denigrated

her performance to Lee and sought permission from Lee to formally discipline her and premised

both upon a concurrently expressed discontent and impatience with the accommodations for her

---

[39] This mechanism for divining discrimination is sometimes referred to as the "cat's paw" theory of liability, whereby "an unoffending decision maker unwittingly bases an adverse employment action on the unlawfully tainted animus of a lower-level employee. In other words, it allows a plaintiff to hold her employer liable for the [discriminatory] animus of a supervisor who was not directly responsible for making the adverse employment action." Daniels v. Pioneer Cent. Sch. Dist., 2012 WL 1391922, at *2 (W.D.N.Y. Apr. 20, 2012). However, as discussed below, this case is more like the cat's claw, given that there was no unwittingness at all herein as to the decisionmakers, but rather full knowledge on their parts of the other employee's "unlawfully tainted animus."

disabilities, with which Lee indeed sympathized (*See* p. 5 n. 8, *supra*). Thus, Lee was no mere

unsuspecting conduit for Upia's animus; she was fully cognizant of, and in fact simpatico with, it

when approving plaintiff's ouster. Barchi, too, was, at the time of her involvement therein,

wholly conscious of Upia's displeasure with plaintiff's light duty and of the concerted pressure

he was applying to plaintiff on account of it, by way of plaintiff's complaint to her about those

very matters.[40] And as a show of just how dead-set she was on plaintiff's dismissal, Barchi stated

that, even if plaintiff had taken Carley's "chips" in error, and thus per Lee had not in fact

committed theft, she *would still have been fired for theft* (Pl. 56.1 Stmt., ¶¶198, 200). That she

and Lee were party to such an indefensible firing after having absorbed Upia's disability-hostile

attitude surely permits the inference that the latter was at the very least "a motivating factor" in

the former. Jian Wang v. IBM Corp., 2014 WL 901507, at *4 n. 3 (S.D.N.Y Feb. 11, 2014).

**B.      Plaintiff Has Adduced Sufficient Proof of Pretext and Thus of Discrimination**

After establishing her prima facie case, the plaintiff must "show that the purported non-

discriminatory reasons" advanced by the employer "are pretextual," Trane v. Northrop Grumman

Corp., 94 F.Supp.3d 367, 376 (E.D.N.Y. 2015), proof that, together with the prima facie case,

"may permit the trier of fact to conclude that the employer unlawfully discriminated," Reeves,

530 U.S. at 148. This showing plaintiff has already made via her discussion of her prima facie

case, and as she "is entitled to rely on the same evidence to support her prima facie case and to

demonstrate pretext," Holleman v. Art Crafting, Inc., 2014 WL 4907732, at *36 (E.D.N.Y. Sept.

30, 2014), she respectfully refers the Court back thereto for purposes of this stage of the analysis.

**CONCLUSION**

Plaintiff respectfully requests that the Court deny defendants' motion in its entirety.

---

[40] Barchi was also copied on the Upia-Lee email exchange referenced above and discussed previously at p. 5 n. 8.

Dated: White Plains, New York
      March 23, 2017

BERNBACH LAW FIRM PLLC

By:   /s/ _____

Jason Bernbach
Jeffrey M. Bernbach
707 Westchester Avenue, Suite 411
White Plains, New York 10604
(914) 422-5717
Attorneys for Plaintiff Araminta Roa